**DAVID J. HOLDSWORTH** (4052)
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT  84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| ANGELEE HARDY, | : | **PLAINTIFF'S VERIFIED** |
| | : | **COMPLAINT** |
| Plaintiff, | : | **(JURY TRIAL DEMANDED)** |
| | : | |
| v. | : | |
| | : | |
| FARMERS SERVICES INSURANCE | : | |
| AGENCY, INC., d.b.a. FARMERS | : | |
| INSURANCE EXCHANGE, | : Civil No. 2:21-cv-00619-TC |
| | : | |
| Defendant. | : Hon. Tena Campbell |

COMES NOW the Plaintiff Angelee Hardy (hereinafter sometimes referred to as "Plaintiff" or "Ms. Hardy"), by and through her counsel, David J. Holdsworth, and complains of Defendant Farmers Services Insurance Agency, Inc., d.b.a. Farmers Insurance Exchange (hereinafter sometimes referred to as "Defendant"), demands trial by jury, and as for causes of action, alleges as follows:

**PARTIES**

1. Petitioner Angelee Hardy is a resident of the State of Utah.

2.      The Defendant is Farmers Services Insurance Agency, Inc., d.b.a. Farmers Insurance Exchange.  At all times relevant hereto, Farmers Services Insurance Agency, Inc., d.b.a. Farmers Insurance Exchange (hereinafter "Farmers" or "Defendant"), employed 15 or more employees, including Plaintiff.

3.      On or about February 9, 2021, Plaintiff submitted an online inquiry to the U.S. Equal Employment Opportunity Commission ("EEOC").  Due to the EEOC's scheduling, the soonest appointment date available for an interview with an EEOC intake representative and Plaintiff was June 4, 2021.  On or about June 15, 2021, Plaintiff filed a Charge of Discrimination with the EEOC, dual-filed with the Utah Labor Commission, in which she alleged that Defendant had discriminated against her based on her gender, and had unlawfully retaliated against her.

4.      Plaintiff filed her Charge of Discrimination within 300 days from the last date of alleged harm.  Plaintiff alleges the harm was a continuing violation.

5.      Plaintiff's claims of gender discrimination and retaliation also fall within the EEOC's 300-day jurisdiction.

6.      Plaintiff is alleging an ongoing, continuing, non-discrete violation. The Court may consider for its determination all discrete events that occurred between 180/300 days prior to the date of filing of June 15, 2021, and the date of filing of June 15, 2021.  Because Plaintiff is alleging a continuing violation, the Court may consider

for its determination all non-discrete events occurring before 180/300 days from the

date of filing.  The Court may give evidence of such events weight for evidentiary

purposes.  Thus, all jurisdictional requirements have been met as required by Title VII

of the Civil Rights Act of 1964, as amended.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the instant case pursuant to

federal question — namely, the interpretation and application of Title VII of the Civil

Rights Act of 1964, as amended, which provide that it is unlawful to discriminate

against an employee in her employment on the basis of her gender, and to retaliate

against an employee for engaging in protected activity.

## STATEMENT OF FACTS

8.     Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 7 above as if alleged in full herein.  In support of her claims,

Plaintiff makes the following allegations of fact:

9.     Plaintiff was hired by Defendant on April 24, 2006, to work as a

Claims Associate.

10.     During her employment with Defendant, Defendant subjected her

to discrimination and harassment based on her gender.

11.    In or about July 2015, Defendant relocated its office to Sandy, Utah, at which time, Defendant instituted a new policy which required employees to utilize individual security access badges to enter the office.

12.    Although the new policy requiring a security access badge was imposed, many employees failed to adhere to the policy and would frequently inquire of Plaintiff and her male counterpart, Jeremy ("Jeremy"), to be allowed entry into the office.  The offending employees were repeatedly reminded by Plaintiff (and by Jeremy) of their responsibility regarding the new security access badge policy.  The refusal of many employees to utilize their individual security access badges became a known problem amongst the staff and management.

13.    This problem became a continual disturbance.  Plaintiff alleges some employees were behaving intentionally to intimidate specifically her.  The offending employees were deliberately creating and exploiting these interactions to be disrespectful and dismissive toward Plaintiff.  Plaintiff encouraged compliance with the policy by such employees but their defiance to Plaintiff's requests continued with increased frequency and at the amusement of such employees.

14.    In or about July/August 2016, Plaintiff documented and discussed in her mid-year review that the tone being set in the office toward her was negative, offensive and intimidating.

4

15.     Plaintiff continued to communicate her concerns regarding this situation to her manager, Tanya Fisher ("Tanya"), and offered suggestions for improvement.

16.     On or about January 5, 2017, Plaintiff participated in a meeting with Tanya regarding the problems concerning the security access badge infractions in the office and the negative behaviors from employees directed at Plaintiff. Plaintiff reminded Tanya of the problem and asserted some employees were purposely not utilizing their badges to disrespect and intimidate Plaintiff. Plaintiff further communicated such employees had been reminded on multiple occasions regarding their responsibility of utilizing their security access badges and the associated policy. Such employees acknowledged and understood their responsibilities when the circumstances were discussed with them and expectations were established with such employees, however, some employees continued to refuse to adhere to the policy and the disrespectful behaviors toward Plaintiff continued. Plaintiff expressed to Tanya that Plaintiff felt singled out and that the  above-reference behavior was intentional toward Plaintiff. Plaintiff was emotional in this meeting and asserted to Tanya that Plaintiff did not wish to be exposed to or tolerate such treatment anymore.

17.     The situation continued to escalate in or about April 2017 when a male office employee fiercely yelled at Plaintiff regarding the security access badge

situation and entry into the office. Immediately following the outburst, a second male

employee approached Plaintiff to essentially defend the outburst directed at Plaintiff

and downplay the situation.

18.     In or about July 2017, another employee angrily yelled at Plaintiff

regarding security access badges and entry into the office.

19.     The above-referenced actions directed at Plaintiff were aggressive

and intended to intimidate her. Plaintiff began feeling unsafe and began experiencing

serious anxiety at work because of the hostile events that occurred.

20.     Plaintiff was treated differently than her male counterpart, Jeremy,

who was involved in the same situation concerning the security access badge

infractions and Jeremy had not experienced the aggressive and intimidating behaviors

from employees that she experienced.

21.     Because Plaintiff is female, employees viewed her as weak and

were more comfortable making demands and exerting power over her than toward her

male counterpart, Jeremy.

22.     In or about July/August 2017, Plaintiff documented and

referenced in her mid-year review, the continuing problem in the office regarding

employees refusing to utilize their security access badges and such circumstances being

escalated to management to initiate a change. The noncompliance with the policy

continued from such employees and their actions had been disrespectful toward

Plaintiff.  Plaintiff further documented, "This has been a very challenging office to be a

part of lately.  There are employees that have made the work environment unpleasant

and have been disrespectful.  Their actions have been a distraction in completing my

duties and I have felt it is important to not engage in these interactions."

23.    In or about August 2017, during her mid-year review conversation

with Tanya, Plaintiff expressed that she had been trying to take herself out of the

interactions with employees that had not been utilizing their security access badges

because she was feeling harassed by such employees and how upsetting it was for

Plaintiff and the negative effect it was having on her work environment.  Tanya

dismissed Plaintiff's complaint of harassment and did not inquire as to any details.

24.    On or about September 20, 2017, Plaintiff participated in a

meeting with Tanya regarding the ongoing problems surrounding the security access

badge infractions and the negative, offensive and unwelcome behaviors occurring in

the office.

25.    On or about September 25, 2017, Plaintiff replied in an email to

Tanya regarding their recent meeting and discussion and declared: "Referring to the

current situation as frustrating is an understatement.  I, along with everyone else,

deserve to come to work in an environment that is not hostile and free from

harassment.  This has not been the case and we are going on two-plus years of this being an issue.  This is not just an issue of employees not being prepared, it has become an issue of not being respectful and considerate to all employees at all levels in the Company.  There have been two instances in particular that two employees on separate occasions were at the window yelling at me to let them in even though there were several other employees by the window that could have been asked.  Both of these employees had been a problem and had been told multiple times to bring their badge.  The actions are very intentional and have gone too far.  I am not here to be belittled and ordered around because I am clerical staff or be it on a personal level.  I expressed in my mid-year as well as in our meeting that I have not been engaging in the interactions with the employees at the window, and have let the other employees let their peers into the office, which has helped my work environment get better.  I feel that you are asking that I put myself back in that negative environment.  Everyone knows this is an issue and they shouldn't need to be continually reminded to be prepared and be respectful."

26.    Plaintiff was emotional during conversations with Tanya wherein Plaintiff expressed she was being harassed.

8

27.   Plaintiff requested of Tanya to be removed from involvement in the situation regarding the security access badge infractions and ensuing offensive behaviors, but Tanya ultimately denied Plaintiff's request.

28.   On or about October 16, 2017, Plaintiff was angrily yelled at again by the same employee who had yelled at her in July 2017 regarding security access badges and entry into the office.

29.   On or about October 19, 2017, Plaintiff participated in a meeting with Tanya regarding Plaintiff's vacation requests.  During this meeting, the situation and behaviors surrounding the security access badge infractions were discussed. Plaintiff reiterated that she considered the behaviors she had been experiencing to constitute harassment to which Tanya dismissed Plaintiff's complaint stating it wasn't harassment.  Tanya told Plaintiff that Plaintiff "can't just throw a word like harassment around" and told Plaintiff to call Human Resources by Wednesday of the next week. Plaintiff responded that she had reservations about contacting Human Resources herself to which Tanya replied that Tanya would, and Human Resources would want dates and names.  Plaintiff answered that she had the dates and names concerning the situation.

30.   Plaintiff affirms that, again, no details surrounding her complaints of harassment were obtained by Tanya and no investigation was completed.

31.     On or about October 26, 2017, Tanya requested Plaintiff attend a meeting with Tanya and Human Resources Manager Nancy Philipp ("Nancy").  While in this meeting, Plaintiff was issued a written warning for unsatisfactory work performance and was placed on corrective action.  Tanya's declarations in this written warning were inaccurate and a misrepresentation of Plaintiff in order to portray Plaintiff unfavorably.  Plaintiff was emotional in this meeting and expressed that what was occurring was not right and that she deserved to be able to come to work and feel safe.  Plaintiff further expressed that the offensive behaviors she had been experiencing from employees in the office constituted harassment and needed to stop.  Nancy supported Tanya's decision of disciplinary action for Plaintiff.  Plaintiff was informed that bi-weekly performance management meetings would take place with Tanya to monitor Plaintiff's performance more closely.  On information and belief, Plaintiff asserts it was Tanya's intention to terminate Plaintiff's employment.

32.     Yet again, no information was inquired, nor was an investigation completed concerning Plaintiff's complaints of harassment.  Defendant repeatedly failed to take prompt and effective remedial action thereby consistently dismissing Plaintiff's complaints, refusing to take her complaints seriously and failing to address the situation appropriately.

33.    The adverse actions taken against Plaintiff were retaliatory and violative of her lawful rights of engaging in a protected activity to oppose harassment in the workplace.

34.    On or about November 9, 2017, Plaintiff attended her first performance management meeting with Tanya since being placed on corrective action. Plaintiff observed a slight adjustment in Tanya's behavior and intentions toward Plaintiff. On information and belief, Plaintiff determined Tanya did not come to this decision personally, especially with Plaintiff's knowledge of Tanya's history with other employees and the undesirable outcomes for such employees. Therefore, Plaintiff presumed Tanya was being forced in this situation and Tanya plausibly experienced some form of disciplinary action for her misconduct and involvement in Plaintiff's disciplinary action which violated Plaintiff's lawful rights. This, consequently, intensified Tanya's animosity toward Plaintiff.

35.    In or about December 2017, Plaintiff engaged in a conversation with a coworker wherein he informed Plaintiff that he heard Human Resources was protecting Plaintiff's job from being fired regarding the circumstances of Plaintiff's disciplinary action. Conversely, Plaintiff presumed it was not her job being protected but rather the Defendant protecting themselves from legal liability because of their blatant mismanagement of the situation. Plaintiff was unaware of the information

11

offered by her coworker and Plaintiff had still been having regular performance

management meetings with Tanya.  Plaintiff's coworker should not have been apprised

of the circumstances surrounding Plaintiff's employment and this revelation constitutes

a gross breach in confidentiality for Plaintiff.

       36.    Even though Plaintiff was not terminated at this juncture, Plaintiff

was not secure in her employment with Defendant and worried an alternate avenue

would be taken to terminate her employment.  Plaintiff began receiving an increased

workload, higher performance expectations and increased scrutiny.  This,

consequently, made Plaintiff's job more difficult to perform and added additional

stress.

       37.    In or about December 2017, Plaintiff documented and referenced

in her year-end review, the negative environment she was experiencing involving the

purposeful and harassing behaviors from employees.  Plaintiff further documented she

had tried to step back from these interactions but was forced back into the harassing

environment at her manager's direction.

       38.    On or about February 15, 2018, Plaintiff attended her 2017

year-end review meeting with Tanya.  Plaintiff disagreed with the ranking and

performance assessment by Tanya that portrayed Plaintiff negatively.

39.    On or about February 20, 2018, Plaintiff documented her final remarks for her 2017 year-end review asserting that there were many inaccuracies with Tanya's statements regarding Plaintiff's performance.  Plaintiff documented that harassment has occurred and continues to occur, and she has been retaliated against. Plaintiff documented it was apparent that negative feedback was being sought by others regarding Plaintiff. Plaintiff documented that these issues have affected her performance negatively.  Plaintiff documented that there still had not been the needed follow through by management in handling her complaints about these problems. Plaintiff further documented that there has been a gross breach in confidentiality and private conversations regarding Plaintiff's performance and the complaints she has made to management.

40.    The biased and unfair poor performance review delivered by Tanya to Plaintiff resulted in Plaintiff receiving a substandard performance ranking, a low merit increase and Plaintiff receiving only half the amount of her eligible bonus. The dishonest portrayal of Plaintiff was an attack on her professionalism and character.

41.    Plaintiff continued to receive unreasonable complaints from employees with such employees criticizing Plaintiff to Tanya.  In one instance, an employee wrote an email to Tanya about Plaintiff in which he noted "just letting you know as you requested."  It was apparent that Tanya was encouraging and seeking

13

negative complaints regarding Plaintiff.  Plaintiff disputed the complaints and emailed

Tanya expressing that the circumstances had become a witch hunt toward Plaintiff.

42.    In or about July 2018, Plaintiff documented in her mid-year

review that the local managers were continuing to receive a report regarding the

security access badge infractions and the behavioral problems that continued to need

attention.

43.    In or about December 2018, Plaintiff documented in her year-end

review that a report was still being provided to local managers to address the

behavioral issues involving employees and the security access badge infractions.

Plaintiff further documented she did not feel certain situations had been handled fairly

or appropriately and she had been subjected to some poor treatment but will always

stand up for herself, even if it meant being treated like an outcast.

44.    On or about February 14, 2019, Plaintiff attended her 2018

year-end review meeting with Tanya.  Near the conclusion of the meeting, Plaintiff

inquired from Tanya how long Plaintiff would still be on the performance management

plan that commenced in October 2017.  Tanya's response was that Plaintiff had not

been on performance management for quite some time.  Plaintiff inquired when that

occurred, and Tanya replied that it had only lasted about 30 days and then "dropped

off".  Plaintiff replied that her understanding of the situation was that the scheduled

meetings between them commencing in October 2017 were ongoing performance management meetings. Tanya replied no, and that Tanya would have been delivering a document to Plaintiff in each meeting formalizing a performance improvement plan for Plaintiff. On the contrary, Plaintiff had not received any such documents during her performance management meetings and the only document Plaintiff received was the written warning from Tanya on October 26, 2017. Plaintiff inquired of Tanya if a signature was needed to remove Plaintiff from performance management to which Tanya replied no, it just "drops off".

45.     Plaintiff had regularly attended the scheduled performance management meetings with Tanya since October 2017 and Tanya had never communicated that Plaintiff had been removed from performance management. Plaintiff was led to believe she had been on performance management for nearly a year and a half which caused Plaintiff undue stress and fear of losing her job during that time. This deliberate and shameful disregard toward Plaintiff displays the unending contempt that Tanya had toward Plaintiff.

46.     Plaintiff was continuing to experience retaliation from Tanya.

47.     On or about February 18, 2019, following Plaintiff's above mentioned 2018 year-end review meeting with Tanya, Tanya electronically supplied her remarks to Plaintiff for Plaintiff's year-end review. In reviewing these remarks,

Plaintiff realized that some of Tanya's remarks were not consistent with the meeting that had just taken place (on February 14, 2019) nor a meeting that Tanya and Plaintiff had had in November 2018.  In November 2018, during a premature year-end review meeting, Tanya stated Plaintiff had a successful year and Tanya could see ranking one of Plaintiff's performance objectives as outstanding.  The new remarks Plaintiff received from Tanya were now more negative and with lower rankings.  Plaintiff was surprised by Tanya's changes and Plaintiff believes Tanya added the unfair negative remarks and rankings after Plaintiff inquired about still being on performance management and it agitated Tanya.  Tanya's animosity toward Plaintiff continued to be detrimental to Plaintiff.

48.     During or about the week of February 18, 2019, Plaintiff placed a call to her Human Resources representative, Josh Kaufman ("Josh"), because of the adverse actions that were continuing to affect her negatively.  Plaintiff inquired of Josh what her personnel file indicated as to when Plaintiff was removed from performance management that commenced in October 2017.  Plaintiff explained to Josh the problems she was experiencing concerning harassment and retaliation.  Josh informed Plaintiff he would review her file and respond back to her.

49.     During or about the week of February 25, 2019, Plaintiff engaged in a follow-up conversation with Josh wherein he stated he did not see a date when

Plaintiff was removed from performance management.  Josh provided limited details to

Plaintiff.  Plaintiff explained to Josh the retaliation she was experiencing and that she

just wanted it to stop.  Plaintiff further explained the inconsistencies with Tanya's

actions and that Plaintiff's reviews and work environment have been negatively

affected.

50.     Once more, no investigation was completed, nor details requested

from Plaintiff by Human Resources concerning Plaintiff's complaints.

51.     On or about March 7, 2019, Plaintiff attended a follow-up meeting

with Tanya regarding Plaintiff's 2018 year-end review to discuss the discrepancies of

Tanya's remarks that were not covered in their previous meeting.  Plaintiff and Tanya

also provided commentary to each other via email in the days following such meeting.

In these conversations, Plaintiff discussed with Tanya the inconsistencies with Tanya's

remarks involving their previous conversations and Plaintiff expressed that Tanya

wasn't taking an objective approach nor being truthful in Plaintiff's reviews.  Tanya

was abusing her authority and continuing to punish Plaintiff.  Plaintiff's reputation was

being ruined by the dishonest portrayal of Plaintiff being a difficult and disruptive

employee.  Plaintiff expressed she believed Tanya and the department supervisors were

trying to manipulate situations to portray Plaintiff negatively and they were out for

Plaintiff's job since October 2017 when Plaintiff was placed on performance

management.  Plaintiff and Tanya discussed Plaintiff being removed from performance management and Tanya stated it happened when their meetings changed from bi-weekly to monthly.  Tanya's declaration contradicted her previous statement of Plaintiff being on performance management for 30 days.  Plaintiff pointed out this inconsistency to Tanya and cited that the two timeframes are several months apart. Plaintiff again declared that no discussion nor notification was provided to Plaintiff from Tanya regarding Plaintiff being removed from performance management. Plaintiff and Tanya also discussed the continuing problem and behaviors in the office concerning the security access badge infractions.  Again, Plaintiff requested to be removed from the situation.  Plaintiff inquired of Tanya why Plaintiff should be involved in the situation given its severity and residual damage it has caused Plaintiff. A new plan was proposed and agreed upon so that Plaintiff was no longer involved in the situation to help improve Plaintiff's environment.

52.    On or about March 14, 2019, Plaintiff documented in her 2018 year-end review that Tanya was continuing to retaliate against Plaintiff and Tanya's animosity was affecting her approach in providing an accurate and fair review of Plaintiff.

53.    On or about April 23, 2019, Plaintiff participated in a meeting with Tanya wherein Tanya reversed her agreement to the new plan regarding

employees gaining access to the office without their security access badges.  Tanya informed Plaintiff that liability claims manager Robb ("Robb") was not on board with the new plan.  Plaintiff expressed displeasure with this decision because of the discussions around the problem and negative interactions and environment it has created for her.  Plaintiff and Tanya agreed to a meeting with Robb and Jeremy to discuss the situation.

54.    On or about May 1, 2019, Plaintiff attended a meeting with Tanya, Robb and Jeremy to discuss the problem surrounding the security access badge infractions in the office.  Plaintiff expressed to Robb the offensive treatment she had received and employees making her work environment hostile.  Plaintiff cited instances of when employees had been aggressive, singled her out and intentional in their behavior toward her which was vastly different than the behavior they exhibited toward Jeremy.  Robb did not consider this situation to be a problem, although he previously stated otherwise and had committed to addressing the infractions with his staff.  The outcome of the meeting was that Plaintiff would still be involved in the situation at Tanya's direction.

55.    On or about May 2, 2019, Plaintiff attended a scheduled monthly meeting with Tanya.  The previous day's meeting was discussed.  Plaintiff explained to Tanya the negative remarks from employees directed at Plaintiff during the previous

several weeks.  Such remarks occurred following the meeting in March 2019 between

Plaintiff and Tanya wherein a new plan concerning the security access badge

infractions was imposed, effectively removing Plaintiff's involvement in the situation.

On or about March 21, 2019, Plaintiff heard an employee in the office making loud

comments exclaiming, "make sure you have your badge" and "you'll have to contact

Jeremy."  Later that day, the same employee exclaimed to other employees "good thing

I know who you are and recognize you to let you in."  On or about April 1, 2019, a

second employee stated to Plaintiff "no, no, I want you to let me in, see, you made this

poor guy get up and let me in" when another employee let him in the office without his

security access badge.  On or about April 17, 2019, a third employee called Plaintiff

"crazy" as he walked by Plaintiff's desk after being let into the office by another

employee.  There were two other occasions in which two liability supervisors made

comments to two new employees regarding Plaintiff advising the employees to make

sure they have their security access badge because of Plaintiff.  Plaintiff expressed to

Tanya these examples demonstrate the extent of the problem and volatile attitude

toward Plaintiff.  Plaintiff expressed her dissatisfaction with Tanya's decision requiring

Plaintiff's involvement in the situation concerning the security access badge infractions

because of the harmful environment it had created for Plaintiff.

56.    During the brief period when the new plan was imposed, several
employees displayed these above referenced tantrums because Plaintiff was no longer
accessible to be harassed in this situation.  The objective was not simply about
employees gaining entry into the office, but rather, demanding that Plaintiff be the one
completing the task so as to exert dominance and control over her.

57.    Yet again, Tanya forced Plaintiff into the situation although Tanya
was fully aware of the emotional anguish it had caused and was causing Plaintiff.  On
one occasion during a prior meeting with Tanya, Plaintiff was emotional because of the
abrasive treatment by employees.  While Plaintiff was clearly upset, Tanya was
attempting to contain her laughter.  It was apparent Tanya viewed these circumstances
as entertaining and her refusal to accommodate a better situation for Plaintiff signifies
the continual and intentional infliction of punishment to Plaintiff.

58.    Additionally, other employees viewed this situation as entertaining
as well.  Employees would make comments to Plaintiff in the office or building
hallway stating, "make sure you have your badge."  A few employees on separate
occasions requested entry into the office even though they had their security access
badges in their immediate possession.  When Robb was notified in August 2017 of his
staff's security access badge infractions, his response was that he understood it was a
problem and would address it, however, the very next day, he requested entry into the

office from Plaintiff claiming he did not have his security access badge.  Tanya would

request entry into the office while smiling and laughing.  When Plaintiff reminded an

employee about unrelated office procedures, he reacted by requesting entry into the

office from Plaintiff the next day.

59.    Plaintiff continued to experience hostilities toward her from

employees.  Two male employees on separate occasions told Plaintiff to "not come

back" when Plaintiff was departing for her break periods.

60.    Some male employees would intentionally leave Plaintiff's desk

disorderly with debris when she was away.  One such employee confirmed his

intentions to Plaintiff a few days afterward by commenting to her that he had made a

mess on her desk.

61.    Another employee approached Plaintiff stating, "can I harass you,

it's actually just a favor."  Such employee was clearly mocking Plaintiff because of

Plaintiff's complaints opposing harassment.

62.    Another male employee commented to Plaintiff stating, "how am I

supposed to throw you under the bus if you have record of everything."

63.    Employees were curt and demanding toward Plaintiff when

interacting or requesting assistance from her.  Plaintiff endured these behaviors from

employees fearing that, if she made further complaints by voicing her concerns about

how she was being treated, she would be punished, and her circumstances would worsen.

64.     On or about February 13, 2020, Plaintiff attended her 2019 year-end review meeting with Tanya.  Plaintiff considered her performance warranted better acknowledgement than Tanya's evaluation, and Tanya was still not providing fair assessments in Plaintiff's reviews.  Plaintiff continued to experience an increased workload and unrealistic expectations and was at a constant disadvantage with Tanya. Plaintiff continued to defend herself from unfair comments from employees who were attempting to negatively influence Plaintiff's reviews.  Plaintiff and Tanya discussed the ongoing behaviors surrounding the security access badge infractions and Tanya did not consider such behaviors a problem.  Plaintiff disagreed stressing the behaviors directed at Plaintiff should not be allowed.

65.     On or about February 28, 2020, Plaintiff documented in her 2019 year-end review that Tanya had provided minimal feedback in Plaintiff's 2019 year-end review compared to Plaintiff's 2019 mid-year review.  Plaintiff documented Tanya's lack of interest to provide a fair review and acknowledge the efforts of Plaintiff.  Plaintiff further documented that Tanya had not fulfilled her commitments from previous agreements with Plaintiff.

66.     In or about July 2020, Plaintiff attended her mid-year review meeting via telephone with Tanya.  Plaintiff continued to not be appropriately acknowledged and Tanya's bias toward Plaintiff affected Tanya's ability to be objective in Plaintiff's evaluations.  Tanya confirmed her assessment was based solely on her perception and she had not sought out feedback from other employees regarding Plaintiff.  Tanya's remarks of Plaintiff were not fully accurate and diminished the efforts of Plaintiff.  The extensive responsibilities performed by Plaintiff producing high quality results were consistently overlooked.

67.     Plaintiff had continued to experience difficult and stressful work situations with Tanya wherein important and necessary communications were not provided to Plaintiff.  Additionally, Tanya removed work assignments from Plaintiff's responsibilities whereas Plaintiff's colleagues were still performing these responsibilities.  Tanya was dishonest with Plaintiff regarding the details of these decisions as Plaintiff had observed a different account than what Tanya communicated. Plaintiff was being intentionally excluded from work assignments in an apparent effort to remove her from her job.

68.     On or about December 10, 2020, during a monthly meeting between Plaintiff and Tanya, they discussed the recent outcome of the voluntary separation program which implemented a companywide staff reduction.  The company

24

announced that a significant number of employees had opted into the program. Tanya

confirmed this announcement and explained to Plaintiff that enough employees had

opted into the program that it sized the company just right and the company was going

to be working with the remaining staff.

69.    Five claims associates within Plaintiff's operating zone had opted

into the voluntary separation program, reducing the clerical staff from twelve to seven.

This reduction in claims associates left offices without clerical support and required the

remaining claims associates to absorb additional responsibilities from the affected

offices in the zone.

70.    On or about January 14, 2021, during a monthly meeting between

Plaintiff and Tanya, Tanya mentioned there had been more employees willing to opt

into the voluntary separation program than the company realized. Tanya and Plaintiff

discussed the changes and additions that had occurred to Plaintiff's responsibilities

resulting from the program's outcome. Tanya affirmed those changes would be the

biggest disruption in Plaintiff's job this year (referring to 2021).

71.    On or about January 21, 2021, Plaintiff joined a conference call

with Tanya and Human Resources Representative Erica Hansen ("Erica"), in which

Plaintiff was informed her position was being eliminated due to a reorganization and

Plaintiff was provided a 60-day notice. Plaintiff was offered severance benefits which

would have required Plaintiff to sign a general release and agreement releasing Defendant of all claims and rights Plaintiff had against Defendant.

72.    Following Plaintiff's involuntary termination notice, Plaintiff discovered that her position was the only one being terminated of the claims associates in her zone.

73.    On or about March 19, 2021, the Interim Head of Property Claims announced that the company would be increasing staffing for the property claims field zones by an additional 35 positions.

74.    Plaintiff's last day of employment with Defendant was on March 22, 2021.

75.    Plaintiff worked hard to be an exceptional employee and performed all her job duties faithfully and with professionalism during her employment with Defendant.  The above-summarized events describe the discrimination and retaliation Plaintiff experienced during her employment with Defendant.  Plaintiff had to repeatedly defend herself from dishonest accusations and endured frequent abuse from other employees.  The dishonest declarations by Defendant and its employees labeled Plaintiff an undesirable employee, which ultimately damaged her reputation.

26

76.    Plaintiff's exercise of her lawful rights resulted in detrimental consequences to Plaintiff.  As a result of Plaintiff's history with Defendant, Plaintiff was wrongfully terminated in retaliation.

77.    Defendant exploited the opportunity to terminate Plaintiff's employment under the pretext of a reorganization especially considering the significant staffing reduction already implemented companywide and within Plaintiff's operating zone, the declarations by Plaintiff's manager that the outcome of the voluntary separation program sized the company just right, and the announcement of increased staffing to property claims.  Defendant was motivated to terminate Plaintiff's employment and decided to use the opportunity of a company reorganization and downsizing to hide its retaliatory motive.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DEFENDANT DISCRIMINATED AGAINST PLAINTIFF
### ON THE BASIS OF HER GENDER

78.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 77 above as if alleged in full herein.

79.    In order to state a prima facie case of discrimination based on gender, Plaintiff must allege facts which establish, or tend to establish, that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3)

27

Defendant subjected her to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination on the basis of gender. *See, generally, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

80.    Plaintiff is a female, and, therefore, a member of a protected class.

81.    Plaintiff's allegations satisfy the first element of the prima facie case.

82.    Plaintiff alleges she was qualified for the position she held.

83.    Plaintiff's allegations satisfy the second element of the prima facie case.

84.    Plaintiff alleges she suffered adverse actions when Defendant allowed employees to harass her on the basis of her gender; when Defendant did not respond appropriately to her complaints, which caused her to have to work in a hostile work environment; when Defendant retaliated against her by, among other actions, deciding to terminate her employment.

85.    Plaintiff's allegations satisfy the third element of the prima facie case.

86.    Plaintiff alleges that the circumstances surrounding the harassment, the adverse actions and the eventual termination of her employment give

rise to an inference of discrimination.  Potential circumstances that give rise to an inference of discrimination include: (1) disparate treatment which, but for the employee's protected trait, would be different, *International Union v.  Johnson Controls, Inc.,* 499 U.S. 187, 200 (1991); or (2) evidence that the protected trait actually motivated the employer's decision.  *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 544 (1971).

87.    Plaintiff alleges that, had she not been female, employees would not have harassed her.  Plaintiff alleges she was treated much less favorably than her male counterpart, Jeremy.  Thus, Plaintiff alleges that, had she not been harassed on the basis of her gender, which caused her to complain of discrimination on the basis of gender and the creation of a hostile work environment; Defendant would not have taken ongoing adverse action against her, including deciding to terminate her employment.  Thus, Plaintiff alleges that Defendant terminated her employment because of her gender.

88.    Plaintiff's allegations establish the fourth element of a prima facie case of discrimination based upon gender.

89.    Plaintiff's allegations state a prima facie case of discrimination based on gender.

**SECOND CAUSE OF ACTION**
**DEFENDANT RETALIATED AGAINST PLAINTIFF**

90.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 89 above as if alleged in full herein.

91.     To state a claim of retaliation, Plaintiff must allege facts which establish, or tend to establish, that: (1) she engaged in protected opposition to discrimination; (2) Defendant subjected her to an adverse employment action contemporaneous with or subsequent to the protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action.

92.     Employees can engage in protected activity in several ways.  One way is by voicing opposition about actions made unlawful by the statutory non-discrimination laws.  The Tenth Circuit has held that, although no magic words are required, to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [the anti-discrimination statutes]".  *Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1203 (10th Cir. 2008).  Plaintiff alleges that she engaged in a protected activity when she complained of harassment and discrimination on the basis of gender and the creation of a hostile work environment.

93.     In this case, Plaintiff alleges that she engaged in protected activity by reporting abusive language and conduct by coworkers towards her because of her being female, which she, in good faith, believed violated Title VII.  Beginning in 2017

30

and thereafter, she frequently complained to her manager about the harassment from employees and how it was negatively affecting her and the environment in which she had to work.  In 2019, Plaintiff contacted Human Resources and complained about the ongoing harassment and retaliation.

94.    Plaintiff's allegations satisfy the first element of a prima facie case of retaliation.

95.    As set forth above, immediately after Petitioner engaged in the protected activity, Defendant began to take adverse employment actions against her.

96.    In regards to adverse and retaliatory action, the courts have noted that adverse treatment includes any act that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  *Rochon v. Gonzales,* 438 F.3d 1210, 1211 (D.C. Cir 2006).  Plaintiff alleges Defendant engaged in adverse action in several ways at various times, including: (1) when, on October 26, 2017, it issued Ms. Hardy a written warning; (2) when it placed her on a disciplinary action plan; (3) her manager tried to sabotage the successful performance of her job, and issued her unfair and negative performance evaluations, which effectively lowered her compensation; (4) her manager increased Plaintiff's responsibilities and her scrutiny of Plaintiff's work performance; and (5) her manager solicited negative feedback from and

exaggerated complaints from employees; and (6) on March 22, 2021, when it terminated her employment.

97.    Plaintiff's allegations satisfy the second element of a prima facie case of retaliation.

98.    Plaintiff alleges a causal connection existed between her protected activity and the adverse actions.

99.    Title VII requires Plaintiff to show that, "but for" her engaging in the protected activity, the adverse employment action would not have occurred. *University of Tex. Southwest. Med. Center v. Nassar,* 133 S.Ct. 2517, 2525 (2013). Plaintiff alleges that had she never complained of harassment, discrimination and retaliation, Defendant would not have terminated her employment.

100.    Plaintiff's allegations satisfy the third element of a prima facie case of retaliation.

101.    Plaintiff's allegations state a prima facie case of retaliation.

## DAMAGES

102.    Ms. Hardy alleges Defendant's actions and inactions have caused her various losses, injuries and other damages, including lost wages, lost benefits, financial stress, emotional distress, damage to her reputation, and damages to her employability.

## V.  RELIEF REQUESTED

Accordingly, based on the above allegations, claims and damages, Plaintiff requests the following relief, specifically an Order and Judgment:

1. Declaring that Defendant discriminated against Ms. Hardy on the basis of her gender and retaliated against her for engaging in protected activity, in violation of Title VII;

2. Declaring that Defendant subjected Ms. Hardy to a hostile work environment;

3. Awarding Ms. Hardy "make whole" relief, including awarding Ms. Hardy her lost wages and benefits, the full value of lost compensation denied due to adverse action and from the time Defendant terminated her employment until Ms. Hardy secures comparable employment, or for a period of five years, whichever occurs first;

4. Awarding Ms. Hardy damages for emotional distress and pain and suffering;

5. Awarding Ms. Hardy punitive damages on the ground that the violations were wilful;

6. Awarding Ms. Hardy her reasonable attorney's fees and costs;

33

7.    Awarding Ms. Hardy such other relief as may be just and

equitable.

DATED this 21st day of October, 2021.


    /s/ David J. Holdsworth
David J.  Holdsworth
*Attorney for Plaintiff*

**VERIFICATION**

Angelee Hardy, being first duly sworn, upon her oath, deposes and says that she is the Plaintiff in the above-entitled action, that she helped prepare and has read the foregoing VERIFIED COMPLAINT and understands the contents thereof, and the statements made therein are true to the best of her knowledge and recollection.


*/s/ Angelee Hardy*_____
Angelee Hardy


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 20___.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:    RESIDING AT: _____

_____